Submitted March 19; reversed and remanded June 16; on respondents' (Aurora Airport Improvement Association; Bruce Bennett; Wilson Construction Company, Inc.; Ted Millar; TLM Holdings, LLC; Anthony Alan Helbling; and Wilsonville Chamber of Commerce) petition for reconsideration filed June 30 and petitioners' response to respondents' petition for reconsideration filed July 7, reconsideration allowed by opinion August 4, 2021
See 313 Or App 725, 492 P3d 782 (2021)

Joseph SCHAEFER,
City of Aurora, City of Wilsonville,
1000 Friends of Oregon, and
Friends of French Prairie,
*Petitioners,*
*and*

CLACKAMAS COUNTY,
*Intervenor-Petitioner below,*

*v.*

OREGON AVIATION BOARD;
Oregon Department of Aviation;
Aurora Airport Improvement Association;
Bruce Bennett; Wilson Construction Company, Inc.;
Ted Millar; TLM Holdings, LLC;
Anthony Alan Helbling; and
Wilsonville Chamber of Commerce,
*Respondents.*

Land Use Board of Appeals
2019123, 2019127, 2019129, 2019130;
A175219

495 P3d 1267

In 2011, the Oregon Aviation Board (board) adopted a Master Plan for the Aurora State Airport. In 2019, the board belatedly adopted findings of land use compatibility for that decision. The board determined that the Master Plan complied with the Marion County Comprehensive Plan and that, because of that compliance, there was no need to consider whether it complied with any statewide planning goals. Alternatively, the board determined that the Master Plan complied with the goals. Petitioners appealed to the Land Use Board of Appeals (LUBA). LUBA concluded that the decision was not a land use decision because, after deciding—correctly, in LUBA's view—that the Master Plan complied with the Marion County Comprehensive Plan, the board did not need to directly apply the goals. Petitioners seek judicial review. *Held*: LUBA erred in excluding the 2011 Master Plan—the Master Plan document that was before the board on October 27, 2011—from the record; in holding that the 2012 Master Plan did not propose airport development on EFU land; in relying on ORS 836.642 to conclude

that proposed new uses at the Aurora State Airport are rural uses for land use purposes; and in determining that OAR 660-012-0065(3)(n) applied.

Reversed and remanded.

Joseph Schaefer filed the brief *pro se*.

Sara Kendrick filed the brief for petitioner City of Aurora.

Barbara A. Jacobson and J. Ryan Adams filed the brief for petitioner City of Wilsonville.

Andrew Mulkey filed the brief for petitioners 1000 Friends of Oregon and Friends of French Prairie.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jona J. Maukonen, Assistant Attorney General, filed the brief for respondents Oregon Aviation Board and Oregon Department of Aviation.

Eric S. Postma and Bittner & Hahs, PC; Wendie L. Kellington and Kellington Law Group, PC, filed the brief for respondents Aurora Airport Improvement Association, Bruce Bennett, Wilsonville Construction Company, Inc., Ted Millar, TLM Holdings, LLC, Anthony Alan Helbling, and Wilsonville Chamber of Commerce.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

ARMSTRONG, P. J.

Reversed and remanded.

**ARMSTRONG, P. J.**

In 2011, the Oregon Aviation Board (board) adopted a Master Plan for the Aurora State Airport. In 2019, the board belatedly adopted findings of land use compatibility to bring its adoption of the Master Plan into compliance with ORS 197.180 and an implementing rule, OAR 738-130-0055(6).[1] The board determined that the Master Plan complied with the Marion County Comprehensive Plan and that, because of that compliance, there was no need to consider whether it complied with any statewide planning goals. Alternatively, the board determined that the Master Plan complied with the goals.

Petitioners appealed to the Land Use Board of Appeals (LUBA), contending that the Master Plan that the board actually adopted in 2011 was not in the record and, in any case, that the 2012 Master Plan, which was in the record, was compatible with neither the Marion County Comprehensive Plan nor the statewide planning goals. Petitioners asserted, among other things, that the Airport Layout Plan contained in the 2012 Master Plan showed the airport development extending onto nearby land that is zoned for Exclusive Farm Use (EFU). LUBA rejected all of petitioners' challenges, concluded that the 2012 Master Plan complied with the Marion County Comprehensive Plan and that the goals did not apply, and dismissed the appeal.

---

[1] ORS 197.180(1) provides as follows:

"Except as provided in ORS 197.277 or subsection (2) of this section or unless expressly exempted by another statute from any of the requirements of this section, state agencies shall carry out their planning duties, powers and responsibilities and take actions that are authorized by law with respect to programs affecting land use:

"(a) In compliance with the goals, rules implementing the goals and rules implementing this section; and

"(b) In a manner compatible with acknowledged comprehensive plans and land use regulations."

OAR 738-130-0055(6) provides as follows: "The Aviation Board shall adopt findings of compatibility with the acknowledged comprehensive plans of affected cities and counties and findings of compliance with applicable statewide planning goals when it adopts the final facility plan."

In 2011, a similar but separate rule, promulgated by the Oregon Department of Transportation, applied to the board's adoption of facility plans like the Master Plan. However, the parties have not addressed any differences between the two rules, and, accordingly, we do not address any differences.

LUBA concluded that the decision was not a land use decision because, after deciding—correctly, in LUBA's view—that the Master Plan complied with the Marion County Comprehensive Plan (MCCP), the board did not need to directly apply the goals.[2] ORS 197.015(10)(a)(B) ("Land use decision" includes "A final decision or determination of a state agency other than the commission with respect to which the agency is required to apply the goals."). Our disposition in this case makes it unnecessary for us to consider whether LUBA's construction of ORS 197.180(1) and ORS 197.015(10)(a)(B) is correct.

Petitioners seek judicial review, contending that, for a variety of reasons, LUBA's decision was unlawful in substance and procedure.[3] As we will explain, we agree with petitioners City of Aurora and City of Wilsonville that LUBA committed procedural error by denying petitioners' objection that the Master Plan approved in 2011 needed to be in the record. We also address various petitioners' contentions that LUBA's order is unlawful in substance because (1) it holds, contrary to the Master Plan document, that the Master Plan does not include airport-related development on EFU land; (2) LUBA incorrectly construed ORS 836.642 and, based on that construction, concluded that the airport expansion complies with various provisions of the MCCP and Goal 14 because any land use at the Aurora State Airport is a rural

---

[2] The board relied on OAR 660-030-0065(2), which provides as follows:

"Except as provided in section (3) of this rule, a state agency shall comply with the statewide goals by assuring that its land use program is compatible with the applicable acknowledged comprehensive plan(s) as provided in OAR 660-030-0070."

The parties have disputed whether that provision applies and, if it does, whether it is valid. However, our disposition makes it unnecessary for us to consider those issues.

[3] Some of the parties have filed joint briefs on judicial review. Petitioners 1000 Friends of Oregon and Friends of French Prairie have filed a joint brief, and we refer to them as 1000 Friends.

Respondents Aurora Airport Improvement Association, Bruce Bennett, Wilson Construction Company, Inc., Ted Millar, TLM Holdings, LLC, Anthony Alan Helbling, and Wilsonville Chamber of Commerce have filed joint briefs, and we refer to them as the private respondents.

Respondents Oregon Aviation Board and Oregon Department of Aviation have filed a joint brief, and we refer to them as the agency respondents.

Petitioners City of Aurora, City of Wilsonville, and Joseph Schaefer have filed individual briefs.

use as a matter of law; and (3) LUBA incorrectly construed OAR 660-012-0065(3)(n) when it held that the changes proposed in the Master Plan were not changes that would "permit service to a larger class of airplane" and, consequently, that the Master Plan complied with Goals 3, 11, and 14 as a matter of law. As explained below, we agree with petitioners on all of those points. We reject without discussion petitioner City of Wilsonville's fourth and fifth assignments of error, and our disposition makes it unnecessary for us to address private respondents' cross-assignment of error.[4] We reverse and remand LUBA's order.

## I.   BACKGROUND

We begin with a brief procedural background and provide additional facts below as we address each of petitioners' arguments. In late 2009, the board began a public process to update the master plan for the Aurora State Airport. At a meeting on October 27, 2011, the board had before it a document entitled Aurora State Airport Master Plan, which we refer to as the 2011 Master Plan. The board adopted a Master Plan at the October 27, 2011, meeting.[5]

After the Federal Aviation Administration (FAA) rejected the preferred development alternative identified in the 2011 Master Plan, the Master Plan was modified in 2012. Throughout this opinion, we refer to the modified master plan document as the 2012 Master Plan or simply the Master Plan. The FAA eventually approved the preferred alternative identified in the 2012 Master Plan, and the director of the Oregon Aviation Department signed the plan. However, the board never formally approved or adopted the 2012 Master Plan after October 27, 2011.

---

[4] In petitioner City of Wilsonville's fourth assignment of error, it contends that the City of Wilsonville and Clackamas County are an "affected city [and] county" under OAR 738-130-000(5). It does not contend that the City of Aurora is an affected city, and we express no opinion on that question.

[5] Petitioner City of Wilsonville contends that the board adopted only the last two chapters of the Master Plan at the October 27, 2011, meeting and argues that LUBA erred in determining that the board legitimately adopted any version of the Master Plan. Likewise, petitioner City of Aurora contends that the 2012 Master Plan was never adopted. LUBA should consider those arguments on remand in light of the complete record. For purposes of this opinion, we assume, without deciding, that the board adopted the 2012 Master Plan on October 27, 2011.

        In 2019, the board adopted findings of land use compatibility for the 2012 Master Plan. The board explained that it had "adopted the Master Plan at its October 27, 2011, meeting."

        Petitioners challenged the land use compatibility findings before LUBA. LUBA rejected all of petitioners' assignments of error to the procedure and substance of the board's findings, and petitioners seek judicial review.

## II.   STANDARD OF REVIEW

        At the outset, we consider our standard of review of LUBA's decision in a case, like this one, where LUBA considered whether "[t]he state agency made a decision that violated the goals." ORS 197.835(9)(b). As always, our task on review is to discern whether LUBA's order is "unlawful in substance or procedure," ORS 197.850(9)(a), and we "may not substitute [our] judgment for that of [LUBA] as to any issue of fact," ORS 197.850(8). Our understanding of how to implement that standard of review turns on LUBA's scope of review.

        ORS 197.835 sets out LUBA's scope of review. For our purposes, the relevant subsection of the statute is subsection (9), which provides as follows:

> "In addition to the review under subsections (1) to (8) of this section, [LUBA] shall reverse or remand the land use decision under review if the board finds:
>
> "(a)   The local government or special district:
>
> "(A)   Exceeded its jurisdiction;
>
> "(B)   Failed to follow the procedures applicable to the matter before it in a manner that prejudiced the substantial rights of the petitioner;
>
> "(C)   Made a decision not supported by substantial evidence in the whole record;
>
> "(D)   Improperly construed the applicable law; or
>
> "(E)   Made an unconstitutional decision; or
>
> "(b)   *The state agency made a decision that violated the goals.*"

(Emphasis added.); *see also* ORS 197.835(8) (LUBA "shall reverse or remand a decision involving the application of a

plan or land use regulation provision if the decision is not in compliance with applicable provisions of the comprehensive plan or land use regulations").

Abundant case law applies our standard of review of LUBA orders applying subsection (9)(a), that is, LUBA orders deciding whether a local government or special district committed reversible error in one of the five specified ways. Under that case law, our review of LUBA's determination of whether a local government made a decision not supported by substantial evidence in the whole record, ORS 197.835(9)(a)(C), is very limited:

> "[W]here LUBA has properly understood and applied the 'substantial evidence' test of ORS 197.835([9])(a)(C), a reviewing court should affirm its order, notwithstanding the reviewing court's disagreement with LUBA as to whether the evidence is 'substantial.' This does not mean, of course, that a reviewing court must blindly accept LUBA's evaluation of substantiality. The evidence in a particular case might be so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review, and reversal or remand might be proper."

*Younger v. City of Portland*, 305 Or 346, 358-59, 752 P2d 262 (1988) (citation omitted). In other words, "where LUBA has review of a local government's findings of fact, we review to determine whether LUBA 'misunderstood or misapplied' the substantial evidence standard of review." *Rogue Advocates v. Jackson County*, 282 Or App 381, 388 n 4, 385 P3d 1262 (2016) (quoting *Younger*, 305 Or at 359).

In contrast with the specificity of LUBA's scope of review established in ORS 197.835(9)(a)(A) through (E), paragraph (9)(b) of ORS 197.835 states only that LUBA shall reverse and remand "if the board finds * * * [t]he state agency made a decision that violated the goals." We have never addressed what our standard of review requires when LUBA has reviewed a state agency decision for compliance with the goals.

Under ORS 197.835(9)(a), LUBA uses an appellate lens to review the local government or special district's decision: LUBA makes determinations about the jurisdiction and

procedural adequacy of the previous decisionmaker, ORS 197.835(9)(a)(A), (B); the sufficiency of the evidence before the previous decisionmaker, ORS 197.835(9)(a)(C); or the legal correctness of the previous decisionmaker's decision, ORS 197.835(9)(a)(D), (E). By contrast, in defining LUBA's scope of review, ORS 197.835(9)(b) does not invoke appellate concepts that would cause LUBA to defer to the factual or legal determinations of any previous decisionmaker. Rather, it appears that, under ORS 197.835(9)(b), LUBA directly assesses, in the first instance, whether the substance of the state agency's decision complied with the goals.

This case does not require us to fully elaborate our standard of review of LUBA's decisions under ORS 197.835(9)(b). In a case like this one, where the central question is whether a facility plan—a document—complies with the goals, and the parties agree (for some purposes, at least) that that document is in the record, our review is largely for mistaken construction of the applicable law; there are few, if any, relevant factual issues for us to review. ORS 197.850 (9)(a). To the extent that we are called on to review LUBA's factual determinations in this case, it suffices to note that, as to the few disputed facts at issue, there is no evidence in the record to support LUBA's erroneous findings.[6]

## III.   ANALYSIS

### A.   *The 2011 Master Plan*

We begin our analysis by considering petitioners' City of Aurora and City of Wilsonville's contention that LUBA erred in denying petitioners' requests to add to the

---

[6] It may be that we review factfinding by LUBA under ORS 197.835(9)(b) for substantial evidence. *Cf.* ORS 197.850(9)(c) (providing that the court shall reverse and remand a LUBA order if "[t]he order is not supported by substantial evidence in the whole record as to facts found by the board under ORS 197.835(2)"); *Rogue Advocates*, 282 Or App at 388 n 4 ("Under ORS 197.850(9)(c), where LUBA itself engages in fact finding [about certain enumerated procedural issues], we review those findings for substantial evidence."). *See also Zimmerman v. LCDC*, 274 Or App 512, 519, 361 P3d 619 (2015) (noting that our review of LUBA's legal determinations is the "functional equivalent" of our standard of review of an agency's legal determination under ORS 183.482(8)(a)); ORS 183.482(8)(c) (Court of Appeals reviews agency factfinding for substantial evidence); ORS 183.482(7) (Court of Appeals "shall not substitute its judgment for that of the agency as to any issue of fact"). However, as noted in the text, we need not decide that question here.

record the Master Plan document that the board had before it on October 27, 2011.

A document entitled Aurora State Airport Master Plan appears in the record. That document includes material created after 2011, including an Appendix to Chapter 5 that narrates events that occurred through at least November 2012.[7] LUBA and the parties agree that the version of the master plan in the record is the 2012 version. That document indisputably was substantially modified after October 27, 2011, by, for example, identifying a different development option as the preferred alternative and omitting some of the discussion and documentation relating to the original preferred alternative. Although the Appendix to Chapter 5 narrates subsequent events and some of the changes that were made, the 2012 Master Plan does not include the text of the 2011 Master Plan or a complete list of changes; it is impossible to identify most of the material that was added and any that was removed after October 27, 2011.

OAR 661-010-0025(1)(b), one of LUBA's evidentiary rules, provides that the record "shall include" "[a]ll written testimony and all exhibits, maps, documents or other materials specifically incorporated into the record or placed before, and not rejected by, the final decision maker, during the course of the proceedings before the final decision maker." Before LUBA, petitioners contended that the document that the board approved on October 27, 2011, was required to be in the record. LUBA did not disagree with that proposition, but rather held that the 2012 Master Plan document included the master plan that had been approved on October 27, 2011. On that ground, it rejected petitioners' contentions that the 2011 Master Plan document had to be included in the record.

On review, petitioners City of Aurora and City of Wilsonville assign error to that ruling, pointing out that there is no evidence that the 2012 Master Plan includes the 2011 version and that the 2012 Master Plan itself demonstrates that it does not include the 2011 version. Agency respondents defend LUBA's determination that the 2012

---

[7] Petitioner City of Wilsonville points out that parts of the 2012 Master Plan are dated later than 2012, including one item that is dated 2017.

Master Plan includes the 2011 Master Plan. For their part, private respondents contend that the proceedings before the board in 2019 are the only "proceedings before the final decision maker" that are at issue here, and that the 2012 Master Plan was the only version of the master plan presented in those proceedings.

We agree with petitioners. First, no evidence supports LUBA's determination that the 2012 Master Plan included the version of the Master Plan approved on October 27, 2011. To the contrary, the 2012 Master Plan itself demonstrates conclusively that the later version is different from the earlier version; it narrates events and explains some of the changes to the document that occurred after 2011, which include identifying a different preferred alternative in the text and on the Airport Layout Plan (ALP). And it is impossible to tell from the 2012 Master Plan what material was added and what was removed after 2011. LUBA erred in concluding that the 2012 Master Plan includes the 2011 Master Plan.

We also reject private respondents' contention that the events of 2019 are the only "proceedings before the final decision maker" at issue here. OAR 661-010-0025(1)(b). The board made its 2019 findings in an effort to comply with OAR 738-130-0055(6), which provides that "[t]he Aviation Board shall adopt findings of [land use] compatibility *** *when it adopts the final facility plan*." (Emphasis added.) Under that rule, the board's adoption of a final facility plan and its land use compatibility findings are two parts of the same proceeding. That remains the case here, notwithstanding the delay between the adoption of the Master Plan and the findings of land use compatibility.[8]

---

[8] Given the process contemplated in OAR 738-130-0055(6) to implement ORS 197.180(1), we also question whether an agency can treat its adoption of a facility plan as final while also contemplating, as the board argues it did here, that the plan may undergo significant changes before it achieves its final form. If the "final facility plan" that is adopted and for which the agency adopts land use compatibility findings is not, in fact, the final version of the facility plan, then it is not clear how the procedure established in OAR 738-130-0055 actually ensures that the agency is "carry[ing] out [its] planning duties, powers and responsibilities and tak[ing] actions that are authorized by law with respect to programs affecting land use" "[i]n compliance with the goals" and "[i]n a manner compatible with acknowledged comprehensive plans and land use regulations." ORS 197.180(1).

The version of the master plan that the board approved on October 27, 2011, along with any other materials that the board considered at that meeting, had to be part of the record before LUBA. OAR 661-010-0025(1)(b). We need not consider whether that procedural error, standing alone, would merit reversal, because, as explained below, we agree with petitioners that the case must be remanded in any event.

B.   *Compliance with the MCCP and the Goals*

    1.   *Marion County's failure to identify conflicts with the MCCP*

We turn to the parties' central contentions about LUBA's determination that the 2012 Master Plan complies with the MCCP and that Goals 3, 11, and 14 do not apply. As an initial matter, we reject the agency respondents' contention that LUBA should not have evaluated the Master Plan for compliance with the MCCP because Marion County was part of the public master planning process and did not identify any conflicts with its comprehensive plan. *See* OAR 738-130-0055(2) (allowing the Oregon Department of Aviation (ODA) to "deem that the draft plan is compatible with that jurisdiction's acknowledged comprehensive plan" if it receives no response from a jurisdiction after providing a draft plan to the jurisdiction).

The agency respondents do not explain, and we do not perceive, how *ODA*'s ability to deem the draft plan compatible with the MCCP affects *the board's* obligation to "adopt findings of compatibility with the acknowledged comprehensive plans of affected cities and counties and findings of compliance with applicable statewide planning goals when it adopts the final facility plan." OAR 738-130-0055(6); *see also* ORS 197.180(1) (requiring state agencies to "take actions that are authorized by law with respect to programs affecting land use *** [i]n compliance with the goals, rules implementing the goals and rules implementing this section; and [i]n a manner compatible with acknowledged comprehensive plans and land use regulations"). Moreover, even to any extent that the board could have relied on ODA's decision to deem a plan compatible with the comprehensive

plan, that is not what the board did in this case; rather, it adopted findings of compatibility.

2. *The Master Plan proposes airport development on EFU land*

We next consider whether the Master Plan proposes airport development on land zoned EFU. Before LUBA, petitioners contended that it did, and, consequently, that the Master Plan was incompatible with the Agricultural Lands policies of the MCCP. Rather than relying on the contents of the Master Plan itself to answer that question, LUBA relied substantially on information provided later, including information about changes, or potential changes, to the board's development plans that took place after the Master Plan was complete, to determine that the Master Plan did not propose airport development on EFU land.

We begin with factual background. The Master Plan contains seven chapters that, together, provide the facts and reasoning to support its proposed development plan, which the Master Plan identifies as the preferred alternative. The preferred alternative is described in text and also depicted in the Airport Layout Plan, or ALP, a set of drawings that makes up Chapter 6. The Master Plan explains that the ALP is "a pictorial culmination of the master planning process." That is, as the Master Plan explains, "[t]he ALP depicts the current airport layout and proposed improvements to the Airport for the 20-year planning period." *See also* OAR 738-005-0010(20) (ALP "refers to a major product of airport master planning"). An ALP must be submitted to the FAA for approval, and "[a]ll airport development carried out at federally obligated airports [like the Aurora State Airport] must be done in accordance with an FAA-approved ALP." OAR 738-005-0010(20).

The state-owned property that the airport occupies is zoned Public (P) in the Marion County Code. On the south and southeast, the airport property ends at Keil Road, and the property across Keil Road from the airport to the south and east is zoned EFU. The ALP in the Master Plan depicts a runway extension of 1,000 feet to the south of the

existing runway, within the boundary of the property that the airport currently occupies. As shown in Figures 1 and 2, at the end of the runway, the ALP depicts an additional chevron-striped stopway continuing southward in line with the runway.[9] The stopway extends beyond the airport property line, across Keil Road, and onto land zoned EFU. The ALP also depicts an Instrument Landing System Localizer extending further beyond the stopway to the south on EFU land.[10] The ALP also depicts part of a taxiway on the east side of the runway (upwards on the ALP drawings) extending off of the airport property, across existing Keil Road (which is shown on the ALP as being rerouted) onto land zoned EFU.

**Figure 1**



---

[9] We have included excerpts from two of the drawings that make up the ALP to make the expansions off the existing airport property more easily understood. Both drawings show the same expansions in the same places.

[10] In light of our conclusion, explained below, that the Master Plan proposes development of the stopway and taxiway on EFU land, we do not reach private respondents' contention, raised in their cross-assignment of error, that the Localizer is an allowed use in the EFU zone.

For the same reason, we do not reach the parties' arguments about the Runway Protection Zone, the Runway Object Free Area, and the relocation of Keil Road. On remand, LUBA may consider those arguments, as well as arguments about the Localizer, in light of our clarification that the Master Plan, and only the Master Plan, embodies the relevant decision.

**Figure 2**



The record also contains additional information about the board's development plans and the significance of the development proposed in an airport master plan. For example, in their testimony, Matthew Maass, ODA Deputy Director, and Aron Fagre, an airport planning expert, explained in a variety of ways that the development shown on the ALP is not actually the development that the board intends for the airport. Maass explained that "[t]he Master Plan is a concept document that shows where future development might go" and that "My understanding is, that it is the intent of this agency to not construct any pavement on current EFU land as part of the runway extension." Fagre indicated that "ALPs are not drawn to surveyed or engineering specificity" and opined that "it is certainly feasible for the airport to construct all improvements—runway, taxiway including run up area and stop way in the Marion County P zone."

LUBA rejected petitioners' arguments that the ALP depicted, and, consequently, the Master Plan proposed, airport development on EFU land. After noting various respondents' arguments, including their contention that the ALP "is not a design-level document or a site plan," LUBA explained, "given respondents' responses [to petitioners' arguments] and the evidence in the record, it is not clear to us that the taxiway and the stopway are

proposed to be located outside the P zone." LUBA also held that

> "respondents' explanation that ODA could choose not to construct the taxiway or install the Localizer if they had to be located on EFU land, and that the stopway will be located in the P zone, undercuts petitioners' speculation that the improvements will be located in the EFU zone. Stated differently, petitioners' speculation that those improvements may be located outside the P zone is, at this point, just speculation, and not enough to demonstrate that the 2012 Airport Plan is incompatible with the MCCP."

LUBA misunderstood its task. It relied on testimony in the record about the board's plans for development to conclude that the board did not intend to construct airport improvements on EFU land. But the question is not what the board's development plans are; the question is what development the Master Plan proposes, and whether *that* development is consistent with the MCCP and the goals. OAR 738-130-0055(6) (requiring the board to adopt land use compatibility findings "when it adopts the final facility plan"); OAR 738-130-0005 (the purpose of ODA's state agency coordination rules is to establish procedures to "assure that [ODA] land use programs"—including "[a]doption of transportation facility plans," OAR 738-130-0025(3)—"are carried out in compliance with the statewide planning goals and in a manner compatible with acknowledged comprehensive plans").

LUBA reasoned that, because the ALP "is not a design-level document or a site plan," it is impossible to assess the development it depicts for compliance with the MCCP and the goals; thus, LUBA relied on other testimony about where the improvements might or might not ultimately be built to determine the Master Plan's compliance with those provisions. That reasoning again misapprehends the task at hand. The ALP is not a casual sketch of potential future development; it is the "pictorial culmination of the master planning process" and it depicts the "proposed improvements to the airport for the 20-year planning period." It must be approved by the FAA, and "[a]ll airport development" "must be done in accordance with" it. OAR

738-005-0010(20). In light of the ALP's role in the master planning process, the ALP drawings are the authoritative documents that determine the location of the improvements proposed by the Master Plan.[11]

The improvements that the ALP depicts extend off the airport property and onto EFU property. Thus, the Master Plan proposes airport development on EFU land. That conclusion requires us to remand to LUBA for reconsideration of its determination that the Master Plan complies with the Agricultural Lands policies of the MCCP.[12]

### 3.  *ORS 836.640 does not apply*

LUBA rejected petitioners' other challenges to the Master Plan's compliance with the MCCP on the ground that those arguments relied on an assumption that the airport expansion was an urban use of rural land, but that ORS 836.640 establishes, as a matter of law, that the airport and the development proposed in the Master Plan are rural uses.[13] On review, petitioners Schaefer and City of Aurora contend that LUBA erred in relying on ORS 836.640 to conclude that the airport development was "rural" for

---

[11] We do not discount the possibility that, once design-level documents for the improvements proposed in the Master Plan are developed, the details of the location of the improvements may change from the locations shown on the ALP drawings. Our point is simply that, as the "final facility plan," OAR 730-130-0055(6), the Master Plan, and its "pictorial culmination," the ALP, are, as a matter of law, sufficiently authoritative to be evaluated for compliance with the MCCP and the goals.

[12] Private respondents contend that the compatibility of the Master Plan with the MCCP was conclusively determined by the Marion County Board of Commissioners' 2013 adoption of a resolution in support of the Master Plan. The resolution states that the Board of Commissioners "acknowledges and supports" the 2012 Master Plan; it is not a determination, formal or otherwise, of the plan's compliance with the MCCP.

[13] Petitioners challenged the Master Plan's compliance with the Rural Development Policies 1, 3, and 4; Rural Services Policies 1 through 4; Special District Policies 6, 7, and 8; Urban Land Use Goals a, b, and c; Urban Growth Policies 1, 2, 3, and 6; Growth Management Framework Purposes 1, 2, 3, and 5; and Growth Management Framework Goals 1, 6, and 7.

Petitioners also contended that the Master Plan conflicted with the MCCP because the 1976 Aurora State Airport Master Plan is part of the MCCP, and it proposed extension of the runway to the north rather than the south. Schaefer renews that argument on appeal. However, in light of our disposition, we do not reach it. LUBA should consider it on remand.

land use purposes.[14] They point out that LUBA has previously held that, "in view of the area served and level of service provided," formerly existing and proposed uses at the Aurora State Airport "are clearly urban public facility uses." *Murray v. Marion County*, 23 Or LUBA 268, 283-84 (1992).

Petitioners' argument requires us to construe ORS 836.642, which we do by "examining the text and context of [the statute], with the goal of determining legislative intent. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009)." *Stop the Dump Coalition v. Yamhill County*, 364 Or 432, 446, 435 P3d 698 (2019). ORS 836.642(1) requires the ODA to "establish a pilot program at up to six rural airports to encourage development of through the fence operations designed to promote economic development."[15] The pilot program "shall operate at" "[t]he Aurora State Airport" and "[n]ot more than five additional rural airports." ORS 836.642(2). "'Rural airport' means an airport described in ORS 836.610(1) that principally serves a city or metropolitan statistical area with a population of 500,000 or fewer." ORS 836.640(4). Thus, ORS 836.642 implies that the Aurora State Airport is a "rural airport," a defined term referring to an airport that "principally serves a city or metropolitan statistical area with a population of 500,000 or fewer."[16]

---

[14] We reject without discussion respondents' contention that these assignments of error are not preserved or were waived before LUBA.

In its order, LUBA indicated that it was relying on ORS 836.642 in part because petitioner Schaefer had not adequately developed an argument to the contrary. Regardless of whether that is accurate with regard to Schaefer, the City of Aurora fully developed its argument that ORS 836.642 was irrelevant to the question at hand, and it renews that argument on appeal.

It is true that neither Schaefer nor the City of Aurora developed extremely detailed arguments against the application of ORS 836.642. That is because, as we explain below, nothing about the statutory text or context suggests that it applies here; thus, very little explanation was required to demonstrate that it did not apply.

[15] "'Through the fence operation' means a customary and usual aviation-related activity that *** [i]s conducted by a commercial or industrial user of property within an airport boundary; and *** [r]elies, for business purposes, on the ability to taxi aircraft directly from the property employed for the commercial or industrial use to an airport runway." ORS 836.640(5).

[16] That statutory implication is in some tension with the Master Plan, which notes that, in the Oregon Aviation Plan, the statewide plan promulgated by the ODA, the Aurora State Airport is categorized as an Urban General Aviation Airport serving the Portland metropolitan area.

LUBA concluded that those statutory provisions establish as a matter of law that all current uses at the Aurora State Airport and the additional development proposed by the Master Plan are rural, rather than urban, uses for purposes of Goal 14 and the MCCP provisions listed above, 312 Or App at 331 n 13. *See generally 1000 Friends of Oregon v. LCDC (Curry Co.)*, 301 Or 447, 724 P2d 268 (1986) (explaining the significance of rural and urban land uses). LUBA misconstrued the statute. As explained below, although ORS 836.642 does address land use, its provisions unambiguously demonstrate that the legislature did not intend its implied categorization of the Aurora State Airport as a "rural airport" to affect the question of whether existing or new land uses at the airport are urban or rural.

ORS 836.642(4) is the only subsection of the statute that addresses land use. It provides:

> "The Department of Land Conservation and Development [(DLCD)], the county and a city, if any, within whose jurisdiction a pilot site is located shall coordinate with the Oregon Department of Aviation to ensure that the applicable comprehensive plans and land use regulations, including airport zoning classifications pursuant to ORS 836.600 to 836.630, facilitate through the fence operations and support the development or expansion of the pilot site *consistent with applicable statewide land use planning requirements.*"

(Emphasis added.) Thus, ORS 836.642 establishes a pilot program encouraging "through the fence programs" at certain "rural airports"—airports serving small cities or metropolitan areas—including Aurora State. It tasks DLCD, the county, and a city with working with ODA to ensure that the applicable comprehensive plans and land use regulations "support the development or expansion of the pilot site *consistent with applicable statewide land use planning requirements.*" ORS 836.642(4) (emphasis added). The text does not suggest that the legislature intended any section of ORS 836.642 to affect how land use requirements apply to the programs or uses of land at the identified airports; to the contrary, it explicitly makes the programs subject to "applicable statewide land use requirements." ORS 836.642(4).

Nor does the legislature's use of "rural" to describe airports eligible for the pilot program suggest anything about how existing or new uses at airports with pilot programs should be categorized for land use purposes. As noted above, in ORS 836.642, "rural airport" is a defined term describing airports serving smaller cities and metropolitan statistical areas. Whether the land uses that exist or are proposed for a "rural airport" are rural or urban is an entirely separate question, one that the statute does not purport to address.

Because private respondents appear to argue that the provisions of ORS 836.600 to 836.630 indicate that ORS 836.642 affects the classification of airport uses as rural or urban, we also briefly address those provisions. In 1995 and 1997, the legislature acted to protect and support existing airports, including by modifying land use laws within airport boundaries. Or Laws 1995, ch 285; Or Laws 1997, ch 859. ORS 836.600 sets out state policy regarding airports:

> "In recognition of the importance of the network of airports to the economy of the state and the safety and recreation of its citizens, the policy of the State of Oregon is to encourage and support the continued operation and vitality of Oregon's airports. Such encouragement and support extends to all commercial and recreational uses and activities described in ORS 836.616(2)."

For purposes of ORS 836.600 to 836.630, airport is defined as

> "the strip of land used for taking off and landing aircraft, together with all adjacent land used in 1994 in connection with the aircraft landing or taking off from the strip of land, including but not limited to land used for the existing commercial and recreational airport uses and activities as of December 31, 1994."

ORS 836.605(2).

ORS 836.616(2) provides that, "[w]ithin airport boundaries established pursuant to [LCDC] rules, local government land use regulations shall authorize" a variety of airport uses. ORS 836.625(1) clarifies that "[t]he limitations on uses made of land in exclusive farm use zones described

in ORS 215.213 and 215.283 do not apply to the provisions of ORS 836.600 to 836.630 regarding airport uses."

In this case, it is undisputed that the relevant part of the airport boundary is the edge of the state-owned airport property that is bordered by Keil Road. *See* OAR 660-013-0040 (the airport boundary, for purposes of ORS 836.616(2), is shown on a map "adopted by a local government" pursuant to "comprehensive plan and land use regulation requirements").[17] As explained above, the provisions of ORS 836.600 to 836.630 allow airport uses and supersede ORS 215.213 and ORS 215.283 "[w]ithin airport boundaries." ORS 836.616(2); *see also* OAR 660-013-0100 (requiring local governments to "adopt land use regulations for areas within the airport boundaries" that authorize the airport uses enumerated in ORS 836.616).

The provisions of ORS 836.600 to 836.630 are independent from ORS 836.640 and ORS 836.642, and they do not suggest that we should understand the latter provisions to have a greater effect on land use than their text indicates. Nor do the provisions of ORS 836.600 to 836.630 apply directly to the airport development that the Master Plan proposes outside the airport boundaries.

In short, nothing about the statutory text or context suggests that LUBA's construction of ORS 836.642 is correct. LUBA erred by relying on ORS 836.642 to conclude that existing and new uses at the Aurora State Airport are rural.[18]

### 4. *OAR 660-012-0065(3)(n) does not apply*

Finally, we consider petitioners 1000 Friends' and Schaefer's contention that LUBA erred in concluding that OAR 660-012-0065(3)(n) excused the board's decision from complying with Goals 3, 11, and 14. The board reasoned

---

[17] The map of the Aurora State Airport that has been adopted by Marion County is the 1976 Master Plan ALP, which is part of the Marion County Comprehensive Plan.

[18] Petitioners Schaefer and City of Aurora also provide legislative history supporting their view of the statute's meaning. However, because the text of the statute unambiguously demonstrates that it has no bearing on whether a use is urban or rural for land use purposes, we need not continue our analysis. *Gaines*, 346 Or at 172.

that the development proposed by the Master Plan would not change the airport's Airport Reference Code, which is described below, and, consequently, that it did not propose expansion or alteration of the airport that would "permit service to a larger class of airplane."[19] Before LUBA, petitioners disputed that contention.

In its order, LUBA adopted the reasoning in the response briefs and concluded, without elaboration, that "the improvements contemplated by the 2012 Airport Plan do not permit service to a larger class of airplanes." The response briefs whose arguments LUBA adopted construe "a larger class of airplanes" to mean a class made up of larger airplanes as measured by their wingspan or tail height.

On judicial review, petitioner 1000 Friends disputes that construction and contends that the development proposed in the Master Plan does permit service to a larger class of airplanes. Both 1000 Friends and Schaefer also argue that LUBA's construction of OAR 660-012-0065(3)(n) conflicts with numerous statutes and the goals because, under LUBA's construction, the rule allows airport development on EFU land without an exception to the goals and without applying the farm-impacts test required by ORS 215.213(10)(b) and ORS 215.283(3)(b).[20]

"When interpreting an administrative rule, we seek to divine the intent of the rule's drafters, employing

---

[19] As an alternative to its conclusion that OAR 660-012-0065(3)(n) applied, the board reasoned that OAR 660-012-0065(3)(a), (b), or (d) applied to some of the challenged airport improvements. It urges us to rely on its alternative reasoning as a ground for rejecting petitioners' challenge to LUBA's interpretation of OAR 660-012-0065(3)(n).

OAR 660-012-0065(3)(a) and (b) address transportation uses that are either allowed by ORS 215.213 or ORS 215.283 or that are accessory to uses allowed under those statutes, subject to the farm-impacts test. *See* ORS 215.213(10)(b); ORS 215.283(3)(b). OAR 660-012-0065(3)(d) allows "[r]ealignment of roads not otherwise allowed under subsection (a) or (b) of this section," subject to application of the farm-impacts tests and the alternatives test set out in OAR 660-012-0065(5). Before LUBA, the board was silent about its alternative reasoning, and it has never identified what airport-related use or uses are allowed, in its view, under ORS 215.283.

LUBA did not acknowledge or address the board's alternative reasoning. Under these circumstances, we leave it to LUBA to consider, on remand, the significance of that alternative reasoning.

[20] Schaefer also raises additional arguments about the rule's validity.

essentially the same framework that we employ when interpreting a statute. Under that analytical framework, we consider the text of the rule in its regulatory and statutory context." *Noble v. Dept. of Fish and Wildlife*, 355 Or 435, 448, 326 P3d 589 (2014) (internal citation omitted) (citing *State v. Hogevoll*, 348 Or 104, 109, 228 P3d 569 (2010)). "In construing statutes and administrative rules, we are obliged to determine the correct interpretation, regardless of the nature of the parties' arguments or the quality of the information that they supply to the court." *Gunderson, LLC v. City of Portland*, 352 Or 648, 662, 290 P3d 803 (2012) (citing *Dept. of Human Services v. J. R. F.*, 351 Or 570, 579, 273 P3d 87 (2012), and *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997)). As explained below, applying those principles, we conclude that LUBA erred in concluding that OAR 660-012-0065(3)(n) applies to the development proposed in the Master Plan.

We begin by considering the statutory and regulatory context of OAR 660-012-0065(3)(n). ORS 215.213 and ORS 215.283 govern uses allowed on EFU land.[21] In subsections (1) and (2), both statutes set out lists of allowed farm and nonfarm uses. Airport development is not one of the uses identified in subsections (1) or (2) of either statute. ORS 215.283(3) and ORS 215.213(10), which have the same text, set out a framework for transportation facilities and improvements that are not addressed in earlier subsections. They provide as follows:

"Roads, highways and other transportation facilities and improvements not allowed under subsections (1) and (2) of this section may be established, subject to the approval of the governing body or its designee, in areas zoned for exclusive farm use subject to:

"(a) Adoption of an exception to the goal related to agricultural lands and to any other applicable goal with which the facility or improvement does not comply; or

"(b) ORS 215.296 for those uses identified by rule of the Land Conservation and Development Commission

---

[21] ORS 215.213 applies in counties that adopted a marginal lands system prior to 1993, and ORS 215.283 applies in nonmarginal lands counties. Each contains the same provision, set out in the text, regarding transportation facilities and improvements. ORS 215.213(10); ORS 215.283(3). ORS 215.283 applies in Marion County, where the airport is located.

[(LCDC)] as provided in section 3, chapter 529, Oregon Laws 1993."[22]

ORS 215.296 sets out the farm-impacts test, which requires assessment of whether a proposed nonfarm use on EFU land would "'[f]orce a significant change' in accepted farm practices or '[s]ignificantly increase the cost' of those practices on surrounding agricultural lands." *Stop the Dump Coalition v. Yamhill County*, 364 Or 432, 434, 435 P3d 698 (2019) (quoting ORS 215.296). Thus, under ORS 215.213 and ORS 215.283, establishing a transportation facility or improvement that is not listed elsewhere in those statutes on EFU land requires either (a) an exception to Goal 2 or, (b) for uses identified by LCDC rule, application of the farm-impacts test.

LCDC is empowered to refine the legislature's policy regarding uses on EFU land "so long as [LCDC's rules] are not *less* restrictive than [ORS 215.213 and ORS 215.283]— that is, if they do not allow *more* uses than the statutes." *Lane County v. LCDC*, 325 Or 569, 583, 942 P2d 278 (1997) (emphases in original). Consistently with the statutory scheme, LCDC has promulgated OAR 660-012-0065 to "identif[y] transportation facilities, services and improvements which may be permitted on rural lands consistent with Goals 3, 4, 11, and 14 without a goal exception." OAR 660-012-0065(1). OAR 660-012-0065(3) provides as follows:

> "The following transportation improvements are consistent with Goals 3, 4, 11, and 14 subject to the requirements of this rule:
>
> "* * * * *
>
> "(n)   Expansions or alterations of public use airports that do not permit service to a larger class of airplanes[.]"

The rule does not elaborate on what it means to "permit service to a larger class of airplanes."

---

[22] Oregon Laws 1993, chapter 529, section 3, provided as follows:

"The Department of Transportation shall, by March 30, 1994, submit to the Land Conservation and Development Commission proposed rules identifying the other roads, highways and transportation facilities that may be allowed pursuant to ORS 215.213(10)(b) and 215.283(5)(b). The Land Conservation and Development Commission shall adopt rules implementing ORS 215.213(10)(b) and 215.283(5)(b) by June 30, 1994."

To understand the rule and the development proposed in the Master Plan, some technical background information is necessary. We begin by considering Airport Reference Codes (ARCs). The FAA uses an ARC to relate airport design standards to the characteristics of the aircraft that use the airport. A given airplane's ARC is made up of a letter, which represents the Aircraft Approach Category and is determined by aircraft approach speed, and a roman numeral, which represents the Airplane Design Group and is determined by wingspan or tail height of the aircraft.

An airport's ARC is the same as the ARC of the airport's "critical aircraft," which, the Master Plan explains, is "the most demanding aircraft that uses the airport 'regularly' or 'substantially.'" The Master Plan explains that the FAA defines "regular" or "substantial" use as "at least 500 annual itinerant operations." The FAA must approve the determination of an airport's critical aircraft. FAA Advisory Circular 150, 5000-17, *Critical Aircraft and Regular Use Determination* (2017), at 2.6, 2-4 (available at https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_150_5000-17.pdf (last accessed June 8, 2021)).[23]

"Different aircraft may define separate elements of airport design. Therefore, effective planning of an airport may need to consider different and multiple Critical Aircraft ***." *Id.* at 3.1.1, 3-1. Above, we explained that the critical aircraft determination takes into account the Aircraft Approach Category (approach speed) and Airplane Design Group (wingspan or tail height) of the aircraft that regularly use the airport. Those classifications determine many of the airfield design standards including runway and taxiway width and separation and the size of various areas at the sides and ends of the runway that protect aircraft and nearby land uses.

---

[23] We take judicial notice of FAA Advisory Circular 150, 5000-17, *Critical Aircraft and Regular Use Determination* (2017) (available at https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_150_5000-17.pdf (last accessed June 8, 2021)), and FAA Advisory Circular 150/5325-4B, *Runway Length Requirements for Airport Design* (2005) (available at https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_150_5325-4B.pdf (last accessed June 8, 2021)). *See, e.g.*, *Thomas v. Wasco County*, 284 Or App 17, 23 n 9, 392 P3d 741 (2017), *rev den*, 362 Or 666 (2018) (taking judicial notice in a LUBA case).

Determining runway length, however, requires reference to a potentially different critical aircraft: The "critical aircraft or grouping of aircraft for runway length" is "the single aircraft, or grouping of aircraft with similar operational requirements, that have the longest runway length requirement that makes regular use of the runway." *Id.* at 3.2.1, 3-1. Generally, runway length requirements for planes up to 60,000 pounds Maximum Certified Takeoff Weight (MTOW) are determined by reference to a "family grouping of airplanes having similar performance characteristics and operating weights." FAA AC 150/5325-4B, *Runway Length Requirements for Airport Design* (2005), ¶ 102, 2 (emphasis omitted) (available at https://www.faa. gov/documentLibrary/media/Advisory_Circular/AC_ 150_5325-4B.pdf (last accessed June 8, 2021)). Those family groupings depend on MTOW and, for small planes up to 12,500 pounds MTOW, approach speed and number of passengers. *See id.*, Table 1-1, at 3. Runway length requirements for planes over 60,000 pounds MTOW are determined by the needs of the particular aircraft, rather than a family grouping. *Id.*

With that background in mind, we return to the text of OAR 660-012-0065(3)(n), which, again, provides that "[e]xpansions or alterations of public use airports that do not permit service to a larger class of airplanes" are consistent with goals 3, 4, 11, and 14 without goal exceptions. As we understand LUBA's reasoning, it concluded that the term "class of airplanes" refers to the Airplane Design Group— the wingspan or tail height. That is, it appears that LUBA understood "larger" in "larger class of airplanes" to refer to the size of the airplanes, and it looked to the physical dimensions of the airplanes, as represented by the Airplane Design Group, to determine airplane size.

The FAA does not use the term "class" to describe airplane sizes.[24] As set out above, however, the FAA groups

---

[24] The FAA does sort airplanes into classes for pilot-licensing purposes. 14 CFR § 61.5(b) (2021). In the aircraft category "airplane," the four classes are "[s]ingle-engine land"; "[m]ultiengine land"; "[s]ingle-engine sea"; and "[m]ultiengine sea." 14 CFR § 61.5(b)(2). None of the parties proposes that that sorting system is the one to which the rule refers, and we agree that that understanding is implausible.

airplanes in several ways; as relevant here, it groups them by weight as well as by wingspan or tail height. Even if we were to accept LUBA's premise that "larger" modifies "airplanes"—that the phrase "larger class of airplanes" is equivalent to "class of larger airplanes"—we do not understand why LCDC would have intended to consider only wingspan or tail height, rather than also including airplanes that are larger by weight.

However, we think it is more likely that, by placing "larger" immediately before "class," rather than immediately before "airplanes," LCDC indicated an intention to refer to a larger—that is, a more inclusive—class of airplanes, rather than merely referring to larger airplanes. With that understanding, and considering that the FAA's method of determining critical aircraft includes consideration of MTOW and approach speed as well as wingspan or tail height, we conclude that LCDC intended "larger class of airplanes" to mean a class that includes airplanes with a greater variety of approach speeds, a greater variety of MTOWs, or a greater variety of wingspans or tail heights.

That textual understanding is consistent with the rule's context. As explained above, the legislature has empowered LCDC to allow certain transportation improvements—improvements that the legislature has not considered important enough to list in sections (1) and (2) of the statutory provisions—on EFU land without exceptions to goals 3, 4, 11, and 14. ORS 215.213(10)(b); ORS 215.283(3)(b). The uses allowed under those provisions necessarily represent LCDC's balancing of goal 12 transportation needs against goals 3, 4, 11, and 14. *See* ORS 197.340(1) (requiring LCDC to "give the goals equal weight in any matter in which the goals are required to be applied"). The considerations that might be relevant to that balancing process are numerous. However, we perceive no reason that LCDC would focus its rule exclusively on the physical dimensions of the wings or tails of airplanes that serve the airport.

The board, and the response briefs whose reasoning LUBA adopted, also reasoned that the development that the Master Plan proposes for the airport does not "permit service" to a larger class of airplanes because, when the Master

Plan was created, the airport's ARC could already have been C-II; that is, it was already serving many of the larger planes that the airport expansion would accommodate.

To assist in our consideration of that argument, we set out additional facts about the airport expansion proposed by the Master Plan. The Master Plan explains that, last time the Master Plan was updated, in 2000, the planned ARC for the airport was B-II:

"According to the 2000 Airport Master Plan, the planned ARC was B-II, exemplified by the King Air turboprop and the Cessna Citation jet. At that time, ODA decided to constrain the forecast by keeping the airfield ARC at B-II. A runway designed for ARC B-II is adequate for about 45% of the business jets manufactured."

(Footnote omitted.) By the time of the 2012 update, the airport had more than 500 annual itinerant operations by airplanes that fit into Aircraft Approach Category C. Consequently, the Master Plan proposed that "the current ARC should be C-II." The Master Plan elaborated:

"The current and forecast ARC is C-II, which reflects a family of business jets. The critical aircraft is the aircraft in ARC that uses the Airport the most. The current critical aircraft is the IAI Astra 1125. A runway designed for ARC C-II would be adequate for about 90% of the business jets manufactured."

(Footnote omitted.)

To explain how the airport could currently be meeting the FAA standards for an ARC of C-II even though it had a planned ARC of B-II and met B-II design standards, the Master Plan explained that "the airfield is adequate for many operators of Aircraft Approach Category C airplanes, even though the Airport does not meet all design standards for ARC C-II."[25]

The Master Plan proposed improvements to the airport to move from ARC B-II design standards to ARC

---

[25] Although the airport's planned ARC was B-II, it met C-II design standards in some respects, including in runway and taxiway width. In addition, larger planes can use airports with shorter runways and other lower-level design standards by employing constrained operations. The Master Plan explains that "[a] constrained operation is one that must reduce payload for takeoff, or stop en route for fuel, for example."

C-II design standards. The improvements necessary to meet C-II design standards were expanding the Runway Safety Area, expanding the Runway Object Free Area, expanding the Obstacle Free Zone, expanding the Runway Protection Zone, and adding runway blast pads.

The Master Plan also proposed lengthening the runway to a length more appropriate for the MTOW classification of the new critical aircraft. The Master Plan explains, "The current runway length of 5,004 feet accommodates 100% of the small aircraft fleet [(MTOW up to 12,500 lbs.)] with fewer than 10 passenger seats. However, the recommended lengths for larger aircraft exceed the current runway length." The development option that the Master Plan proposed included a runway expansion of 1,000 feet, yielding a 6,004-foot runway. The Master Plan identified a 5,500-foot runway as adequate for 100% of large airplanes with MTOW between 12,500 and 60,000 at 60% of their useful load. The Master Plan also explained, "The runway extension [(of 1,000 feet)] would accommodate nearly all business Jets with ARC C-II and below that could potentially operate at the Airport."

As explained above, the board reasoned (and respondents argued before LUBA) that the development proposed by the Master Plan would not "permit service to a larger class of airplanes" because, although the airport's planned ARC was B-II, the airport already served enough planes with an ARC of C-II to bring its ARC up to C-II. They contended that the airport expansion would not "permit service" to a larger class of airplanes because the airport already served larger airplanes. LUBA apparently agreed.

As we understand that argument, it construes "permit" to mean "to make possible." *Webster's Third New Int'l Dictionary* 1683 (unabridged ed 2002). Thus, the reasoning goes, because it is already possible for a larger class of airplanes to use the airport, the expansion does not "permit" service to those airplanes.

"Permit" also has another meaning: "to give (a person) leave **:** authorize." *Id.* If we understand "permit service" to be synonymous with "authorize service," then the rule is focused on the design capacity of the airport's facilities,

rather than the airplanes that it is possible for the facilities to accommodate. Under that interpretation, the question is whether the expansion or alteration of the airport authorizes service to a larger class of airplanes by increasing airport design standards or, by contrast, whether the expansion or alteration merely updates airport facilities within the existing design standards.

The latter construction is more consistent with the rule's context. If "permit" means "make possible," the rule allows nearly all expansions or alterations of public-use airports on EFU land. Many large airplanes can use an airport the size of Aurora State by means of constrained operations or in an emergency; the Master Plan documents service at Aurora State to planes with an ARC of D-III and a plane with an MTOW of 93,500 pounds. *See also* FAA AC 150/5000-17, *Critical Aircraft and Regular Use Determinations*, 3.11.1, at 3-4 ("[T]he airport sponsor cannot restrict airport access based on design standards without an FAA determination * * *."). Because it is already possible for very large airplanes to use the airport, very few, if any, expansions or alterations will make it possible for a larger class of airplanes to use the airport.

Furthermore, as explained above, an airport's ARC increases only when the ARCs of the aircraft that *currently use* the airport have increased, because the critical aircraft determines the airport's ARC, and the critical aircraft is based on the airplanes that "regularly" or "substantially" use the airport. Consequently, an airport expansion or alteration that increases ARC design standards will always follow increased service to larger airplanes; it will never precede that service. If "permit service" means to make service possible, then an alteration or expansion that increases design standards will always fall within the rule—and be exempt from the goals—because that alteration or expansion will merely bring the airport facilities up to the design standards required by the airplanes currently served.

By contrast, if "permit service" means "authorize service," then the focus of the rule is on the design and size of the airport facilities, a logical consideration given the rule's context. As explained above, OAR 660-012-0065(3)(n)

represents LCDC's decision on how to balance goal 12 transportation needs against goals 3, 4, 11, and 14. In that context, LCDC likely intended the rule to focus on airport design and space needs, not whether it is possible for larger and faster planes to use runways that are designed for smaller, slower planes.

We conclude that LCDC intended "permit service" to mean "authorize service." With that understanding, an upgrade to design standards for a greater ARC or a longer runway to serve planes with greater MTOW is an expansion or alteration that permits—authorizes—service to a larger class of airplanes. Airplanes in the upgraded ARC or the greater MTOW grouping are then among the airplanes authorized to use the airport by virtue of its design standards.

Thus, an "expansion[] or alteration[] of a public use airport that do[es] not permit service to a larger class of airplanes" is an expansion or alteration that does not authorize the airport, by increasing design standards or otherwise, to serve a group of airplanes with a greater variety of approach speeds, a greater variety of MTOWs, or a greater variety of wingspans or tail heights. OAR 660-012-0065(3)(n). The Master Plan proposes increasing the airfield design standards from ARC B-II to ARC C-II and increasing the length of the runway to accommodate airplanes that approach the runway faster and airplanes that have an MTOW over 12,500 pounds. Accordingly, the Master Plan proposes an alteration or expansion of the airport that permits service to a larger class of airplanes.[26]

To summarize, LUBA erred in excluding the 2011 Master Plan—the Master Plan document that was before the board on October 27, 2011—from the record; in holding

---

[26] In light of our conclusion that OAR 660-012-0065(3)(n) does not cover the airport expansion proposed in the Master Plan, we need not consider petitioners 1000 Friends' and Schaefer's contentions that the rule is invalid. We do note, however, that nothing in the text of the rule suggests that LCDC intends to allow any transportation improvements on EFU land without applying the farm-impacts test; the rule does not purport to supersede the statutory requirement that "[r]oads, highways and other transportation facilities and improvements" not otherwise addressed in ORS 215.213 and ORS 215.283 can be allowed without a goal exception only if they are also "subject to" "ORS 215.296," the farm-impacts test. ORS 215.213(10); ORS 215.283(3).

that the 2012 Master Plan did not propose airport development on EFU land; in relying on ORS 836.642 to conclude that proposed new uses at the Aurora State Airport are rural uses for land use purposes; and in determining that OAR 660-012-0065(3)(n) applied.

Reversed and remanded.