Submitted January 7, reversed and remanded March 30, 2022

Joseph SCHAEFER,
*Petitioner,*

*v.*

MARION COUNTY
and TLM Holdings, LLC,
*Respondents.*

Land Use Board of Appeals
2020108; A177262

509 P3d 718

TLM Holdings, LLC (TLM) applied for, and Marion County approved, a comprehensive plan map amendment, a zoning map amendment, exceptions to statewide land use planning Goals 3 and 14, and a conditional use permit for a variety of uses on a 16.54-acre parcel adjacent to the airport. Land Use Board of Appeals concluded that, pursuant to OAR 660-012-0065(3)(n), the development that TLM proposes for the parcel is consistent with Goals 3, 4, 11, and 14 without a goal exception. *Held*: OAR 660-012-0065(3)(n) provides that "[e]xpansions or alterations of public use airports that do not permit service to a larger class of airplanes" are consistent with Goals 3, 4, 11, and 14. An expansion of a public use airport occurs when, pursuant to OAR chapter 660, division 13, a local government adopts a map showing an airport boundary that includes a larger area than the boundary shown on the previously adopted map of the airport. Requests for comprehensive plan amendments and zone changes, like the ones at issue here, sought by private parties without corresponding expansion of the airport boundary through the airport planning process are not expansions of public use airports within the meaning of OAR 660-012-0065(3)(n).

Reversed and remanded.

Joseph Schaefer filed the briefs *pro se*.

Scott A. Norris filed the brief for respondent Marion County.

Alan M. Sorem and Saalfeld Griggs PC filed the brief for respondent TLM Holdings, LLC.

Andrew Mulkey filed the brief *amicus curiae* for 1000 Friends of Oregon.

Emily Gilchrist filed the brief *amicus curiae* for City of Aurora.

Before James, Presiding Judge, and Lagesen, Chief Judge, and Kamins, Judge.

KAMINS, J.

Reversed and remanded.

**KAMINS, J.**

This case presents a dispute about compliance with statewide land use planning goals on land near the Aurora State Airport. Petitioner Schaefer seeks review of an order of the Land Use Board of Appeals (LUBA) affirming Marion County's approval of TLM Holdings, LLC's (TLM's) application for a comprehensive plan map amendment, a zoning map amendment, exceptions to statewide land use planning Goals 3 and 14, and a conditional use permit for a variety of uses on a 16.54-acre parcel adjacent to the airport. LUBA concluded that, pursuant to OAR 660-012-0065(3)(n), the development that TLM proposes for the parcel is "consistent with Goals 3, 4, 11, and 14 without a goal exception," OAR 660-012-0065(1).

OAR 660-012-0065(3)(n) provides that "[e]xpansions or alterations of public use airports that do not permit service to a larger class of airplanes" are consistent with Goals 3, 4, 11, and 14.[1] In *Schaefer v. Oregon Aviation Board*, 312 Or App 316, 345, 495 P3d 1267, *adh'd to as modified on recons*, 313 Or App 725, 492 P3d 782, *rev den*, 369 Or 69 (2021), we interpreted the phrase "permit service to a larger class of airplanes" in that rule provision. Here, we interpret the phrase "[e]xpansions *** of public use airports."[2] OAR 660-012-0065(3)(n). As explained below, we conclude that an expansion of a public use airport occurs when, pursuant to OAR chapter 660, division 13, a local government adopts

---

[1] We recently explained as follows:

"[The Land Conservation and Development Commission] has promulgated OAR 660-012-0065 to 'identif[y] transportation facilities, services and improvements which may be permitted on rural lands consistent with Goals 3, 4, 11, and 14 without a goal exception.' OAR 660-012-0065(1). OAR 660-012-0065(3) provides as follows:

"'The following transportation improvements are consistent with Goals 3, 4, 11, and 14 subject to the requirements of this rule:

"'*****

"'(n) Expansions or alterations of public use airports that do not permit service to a larger class of airplanes[.]'"

*Schaefer v. Oregon Aviation Board*, 312 Or App 316, 338, 495 P3d 1267, *adh'd to as modified on recons*, 313 Or App 725, 492 P3d 782, *rev den*, 369 Or 69 (2021) (brackets in *Schaefer*).

[2] As LUBA noted, the parties agree that TLM's proposal would not permit service to a larger class of airplanes.

a map showing an airport boundary that includes a larger area than the boundary shown on the previously adopted map of the airport. Requests for comprehensive plan amendments and zone changes, like the ones at issue here, sought by private parties without corresponding expansion of the airport boundary through the airport planning process are not expansions of public use airports within the meaning of OAR 660-012-0065(3)(n).

Accordingly, LUBA erred in affirming the county's determination that TLM's proposal to develop its parcel adjacent to the airport qualifies as an expansion of a public use airport under OAR 660-012-0065(3)(n) and, consequently, is "consistent with Goals 3, 4, 11, and 14 without a goal exception," OAR 660-012-0065(1). Thus, we reverse and remand.

"[O]ur task on review is to discern whether LUBA's order is 'unlawful in substance or procedure,' ORS 197.850(9)(a), and we 'may not substitute [our] judgment for that of [LUBA] as to any issue of fact,' ORS 197.850(8)." *Schaefer*, 312 Or App at 321 (brackets in original). Here, the question is whether LUBA's order was "unlawful in substance," that is, whether "it represented a mistaken interpretation of the applicable law." *Mountain West Investment Corp. v. City of Silverton*, 175 Or App 556, 559, 30 P3d 420 (2001).

## I.  FACTS

The relevant facts are undisputed. The Aurora State Airport is located in Marion County and operated by the Oregon Department of Aviation. All of the land that is currently developed for airport-related uses is zoned Public (P). Some of that land is owned by the state and some of it is privately owned.

The 1976 Aurora State Airport Master Plan, including its airport layout plan, which is a map of the airport, is part of the Marion County Comprehensive Plan. The 1976 airport layout plan shows the subject property outside what it refers to as the "ultimate airport property"—that is, the boundary of the property proposed, in the 1976 Master Plan, to be used as an airport. The "ultimate airport property" on that plan includes the state-owned airport property and, in

addition, some privately owned property. The plan includes the following note on the subject property:

"THIS AREA ACCEPTABLE FOR
AIRPORT RELATED DEVELOPMENT
UNDER PRIVATE OWNERSHIP"

The privately owned land that is part of the "ultimate airport property" on the 1976 airport layout plan is zoned P and is developed for airport-related uses. The subject parcel is adjacent to some of that property; however it is in a Primary Agriculture (PA) comprehensive plan designation and is zoned for Exclusive Farm Use (EFU). The subject parcel is benefited by an easement that allows its owners use of a paved taxi lane on adjoining property, which provides access to the airport runway.

TLM applied to Marion County for a comprehensive plan map amendment to change the comprehensive plan designation from PA to public and semi-public; a zoning map amendment to change the zoning from EFU to P with a limited use overlay; exceptions to Goals 3 and 14; and a conditional use permit "to authorize the future development of ten categories of airport-related uses" on the subject parcel. Although the application included a site plan and a description of development, it noted that the site plan and descriptions were "conceptual only."

The county approved the application with conditions, reasoning that (1) under OAR 660-012-0065(3)(n), the comprehensive plan and zoning changes did not require goal exceptions because the application was for an "[e]xpansion[] *** of [a] public use airport[] that does not permit service to a larger class of airplanes," and (2) in the alternative, goal exceptions were justified. Petitioner appealed to LUBA, and LUBA agreed with the county's first conclusion and, consequently, declined to address petitioner's assignments of error directed at the county's second line of reasoning.[3]

---

[3] Our summary in the text is limited to the parts of the county's decision and LUBA's order that are relevant to the issue that we decide. On another issue, LUBA determined that the county's findings regarding Goal 6 were inadequate in one respect and remanded for the county to reconsider its decision on that issue.

On judicial review, petitioner, joined by *amici* 1000 Friends of Oregon and the City of Aurora, contends that LUBA erred in a variety of ways. In his first assignment of error, he argues that TLM's application was not for an expansion of a public use airport within the meaning of OAR 660-012-0065(3)(n), and that LUBA erred in concluding that the rule applies to situations like this one. TLM and Marion County respond that LUBA correctly interpreted the rule.

"'When interpreting an administrative rule, we seek to divine the intent of the rule's drafters, employing essentially the same framework that we employ when interpreting a statute. Under that analytical framework, we consider the text of the rule in its regulatory and statutory context.'" *Schaefer*, 312 Or App at 336-37 (quoting *Noble v. Dept. of Fish and Wildlife*, 355 Or 435, 448, 326 P3d 589 (2014) (internal citation omitted)). "'In construing statutes and administrative rules, we are obliged to determine the correct interpretation, regardless of the nature of the parties' arguments or the quality of the information that they supply to the court.'" *Id.* at 337 (quoting *Gunderson, LLC v. City of Portland*, 352 Or 648, 662, 290 P3d 803 (2012) (citing *Dept. of Human Services v. J. R. F.*, 351 Or 570, 579, 273 P3d 87 (2012), and *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997)).

Here, as explained above, we must determine the meaning of "[e]xpansions *** of public use airports" in OAR 660-012-0065(3)(n). As LUBA observed, the Land Conservation and Development Commission (LCDC) originally adopted a rule using that phrase in 1991, OAR 660-012-0065(4)(o) (May 8, 1991), and adopted OAR 660-012-0065(3)(n) in its current form in 1995. LUBA held that LCDC intended "'public use airports' to mean airports that are '[o]pen to the flying public considering performance and weight of the aircraft being used. May or may not be attended or have services available.'" (Quoting OAR 738-020-0015 (2)(b) (Sept 20, 1989).). LUBA rejected petitioner's argument that the proposed development was not an expansion of a public use airport, explaining that "OAR 660-012-0065(3)(n) applies to the proposed comprehensive plan map and zoning

map amendments to expand the Airport because the Airport is a 'public use airport.'"

We agree with LUBA that the Aurora State Airport is a public use airport as contemplated by the rule. Indeed, petitioner has never disputed that point. Rather, the argument that petitioner raised before the county, reiterated before LUBA, and renews on judicial review is that *the requested land use actions and proposed development* do not constitute an expansion of a public use airport. As explained below, we agree with petitioner.

## II.   ANALYSIS

As LUBA noted, the initial question here is what LCDC intended by "[e]xpansions * * * of public use airports" in 1995, when it adopted the current version of the rule. As noted above, it is undisputed that the Aurora State Airport is a public use airport. And "expansion" had then, and continues to have, a straightforward meaning here: "Expansion" means "the act or process of increasing in extent, size, number, volume, or scope : ENLARGEMENT, GROWTH." *Webster's Third New Int'l Dictionary* 798 (unabridged ed 2002); *see also id.* ("expand" means "to increase the extent, size, number, volume, or scope of : ENLARGE").[4] Thus, we conclude that LCDC intended the phrase to refer to the act or process of increasing the size or extent of a public use airport.[5]

That leaves the question of what act or process increases the size of a public use airport. That turns on sources of law other than LCDC's rule, and those sources of law have changed significantly since the rule's adoption. However, as the parties appear to recognize, the rule does not purport to preserve permanently the statutory and regulatory scheme that governed increases in the size of public

---

[4] As the Supreme Court has noted, "'any version of *Webster's Third*—regardless of its copyright date—provides a relevant source of ordinary meaning for statutes enacted any time after 1961.'" *Jones v. Four Corners Rod & Gun Club*, 366 Or 100, 114, 456 P3d 616 (2020) (quoting *State v. Eastep*, 361 Or 746, 751 n 2, 399 P3d 979 (2017)).

[5] In these circumstances, we understand "size" and "extent" to be synonymous. *Webster's* at 805 (defining "extent" as "the amount of space which something occupies or the distance over which it extends : the length, width, height, thickness, diameter, circumference, or area of something : DIMENSIONS, PROPORTIONS, SIZE, MAGNITUDE, SPREAD").

use airports when the rule was adopted. Rather, the rule simply provides that an act or process that increases the size of a public use airport (that does not permit service to a larger class of airplanes) is consistent with Goals 3, 4, 11, and 14, and it is up to the legislature and, as directed by the legislature, administrative agencies, to specify the acts or processes that increase the size of a public use airport. Thus, we look to current statutes and rules to determine what acts or processes increase the size of a public use airport.

A.   *Airport Boundaries*

In 1995, the legislature acted to integrate existing airports into Oregon's land use system. Or Laws 1995, ch 285. The bill defined "airports" as "the strip of land used for taking off and landing aircraft, together with all adjacent land used in 1994 in connection with the aircraft landing or taking off from the strip of land, including but not limited to land used for the existing commercial and recreational airport uses and activities as of December 31, 1994." Or Laws 1995, ch 285, § 3. Thus, although the bill did not refer to airport boundaries, it effectively created airport boundaries by defining which land qualified as "airports." The bill also required LCDC to enact rules establishing permissible uses on airports and instructed local governments to amend their comprehensive plans and land use regulations to include airports and allow the uses set out in the rules. Or Laws 1995, ch 285, §§ 4, 5.

In 1997, the legislature amended the provisions that it had enacted in 1995. Or Laws 1997, ch 859. It did not amend the 1995 definition of "airports," which remains in the statute today. ORS 836.605(2). Among other things, the 1997 bill specified that LCDC "shall adopt rules for uses and activities allowed within the boundaries of airports identified in ORS 836.610(1)."[6] Or Laws 1997, ch 859, § 5. It also required LCDC to adopt rules establishing airport boundaries: "Within airport boundaries established pursuant to commission rules, local government land use regulations

---

[6] Airports identified in ORS 836.610(1) include "[p]ublicly owned airports registered, licensed or otherwise recognized by the Department of Transportation on or before December 31, 1994, that in 1994 were the base for three or more aircraft." ORS 836.610(1)(a). The Aurora State Airport meets those specifications. OAR 738-090-0030(1)(a) (Exhibit 1).

shall authorize the following uses and activities[.]" *Id.* Those provisions remain in effect. ORS 836.616(1), (2).

The rules that LCDC adopted pursuant to those sections are OAR chapter 660, division 13, entitled "Airport Planning." OAR 660-013-0010(1) ("This division implements ORS 836.600 through 836.630 and Statewide Planning Goal 12 (Transportation)."). Similar to ORS 836.605(2), those rules define "airport" as "the strip of land used for taking off and landing aircraft, together with all adjacent land used in connection with the aircraft landing or taking off from the strip of land, including but not limited to land used for existing airport uses." OAR 660-013-0020(1).

OAR 660-013-0040 requires local governments to adopt detailed airport plans, which include a variety of maps and data about current airport uses and facilities, as well as future needs. The "economic and use forecast information" necessary for an airport plan is provided by the airport's sponsor, which, in the case of publicly owned airports like Aurora State, is the Oregon Department of Aviation.[7] OAR 660-013-0040(9).

The first planning requirement that the rule establishes is

"[a] map, adopted by the local government, showing the location of the airport boundary. *The airport boundary shall include the following areas*, but does not necessarily include all land within the airport ownership:

"(a)   Existing and planned runways, taxiways, aircraft storage (excluding aircraft storage accessory to residential airpark type development), maintenance, sales, and repair facilities;

"(b)   Areas needed for existing and planned airport operations; and

"(c)   Areas at non-towered airports[8] needed for existing and planned airport uses that:

_____

[7] "Sponsor" means "the owner, manager, other person, or entity designated to represent the interests of an airport." OAR 660-013-0020(6).

[8] For purposes of the rule, the Aurora State Airport is a non-towered airport. *See* OAR 660-013-0020(4) ("'Non Towered Airport' means an airport without an existing or approved control tower on June 5, 1995.").

"(A)   Require a location on or adjacent to the airport property;

"(B)   Are compatible with existing and planned land uses surrounding the airport; and

"(C)   Are otherwise consistent with provisions of the acknowledged comprehensive plan, land use regulations, and any applicable statewide planning goals.

"(d)   'Compatible,' as used in this rule, is not intended as an absolute term meaning no interference or adverse impacts of any type with surrounding land uses."

OAR 660-013-0040(1) (emphasis added).

The airport boundary is expanded based on need, demonstrated through data and forecasting: Additional planning requirements include:

"(4)   A projection of aeronautical facility and service needs;

"(5)   Provisions for airport uses not currently located at the airport or expansion of existing airport uses:

"(a)   Based on the projected needs for such uses over the planning period;

"(b)   Based on economic and use forecasts supported by market data;

"(c)   When such uses can be supported by adequate types and levels of public facilities and services and transportation facilities or systems authorized by applicable statewide planning goals;

"(d)   When such uses can be sited in a manner that does not create a hazard for aircraft operations; and

"(e)   When the uses can be sited in a manner that is:

"(A)   Compatible with existing and planned land uses surrounding the airport; and

"(B)   Consistent with applicable provisions of the acknowledged comprehensive plan, land use regulations, and any applicable statewide planning goals.

"* * * * *

"(9)   Local government shall request the airport sponsor to provide the economic and use forecast information

required by this rule. The economic and use forecast information submitted by the sponsor shall be subject to local government review, modification and approval as part of the planning process outlined in this rule. Where the sponsor declines to provide such information, the local government may limit the airport boundary to areas currently devoted to airport uses described in OAR 660-013-0100."

OAR 660-013-0040.

Those provisions clearly identify the act that increases the size of a public use airport like Aurora State. The airport boundary establishes the size of the airport. *See Webster's* at 260 (defining "boundary" as "something that indicates or fixes a limit or extent : something that marks a bound (as of a territory or a playing field) : a bounding or separating line"). Thus, the local government's act of adopting a map showing an airport boundary that is larger than the boundary shown on the previously adopted map is the act that increases the size of the airport. That act is the end product of the airport planning process governed by OAR chapter 660, division 13.

The parties dispute the role that the definition of "airports" in ORS 836.605(2) plays in the analysis of what act or process increases the size of an airport. That statute defines an "airport" as "the strip of land used for taking off and landing aircraft, together with all adjacent land used in 1994 in connection with the aircraft landing or taking off from the strip of land, including but not limited to land used for the existing commercial and recreational airport uses and activities as of December 31, 1994." Petitioner contends that the definition limits airport boundaries while respondents reason that the definition expands them. As explained below, that definition does neither; rather, it is consistent with our understanding of the scheme described above.

Petitioner appears to be of the view that, given that statutory definition of "airports," airport boundaries are frozen at their 1994 size and cannot be expanded. That understanding overstates the significance of the statutory definition. As we have explained, airport boundaries were established by the definition of "airports" in ORS 836.605(2), which identified which land constituted existing airports at

that time. In the same 1995 bill, the legislature required LCDC's rules to "allow for the reasonable growth of" "[p]ermissible commercial and recreational airport uses and activities." Or Laws 1995, ch 285, § 5(2), (3). Thus, when the statutory provision was enacted, it was not intended to prohibit future expansion of airport uses, and, consequently, airport boundaries. Subsequently, in 1997, the legislature tasked LCDC with adopting rules that would establish airport boundaries, ORS 836.616(2), and LCDC has done that—including providing for how airport boundaries are to be expanded—in OAR 660-013-0040(1). Given that scheme, the definition of "airports" in ORS 836.605(2) does not limit airport boundaries to their 1994 sizes.

On the other hand, respondents contend that, under the statutory definition, all land adjacent to an airport runway (and apparently also all land, like the subject parcel, adjacent to land adjacent to an airport runway) can be part of the "public use airport" regardless of the location of the airport boundary.[9] That view ignores the significance—and even the existence—of airport boundaries in the statutory and regulatory scheme. As set out above, ORS 836.605(2) defines an "airport" as "the strip of land used for taking off and landing aircraft, together with all adjacent land used in 1994 in connection with the aircraft landing or taking off from the strip of land, including but not limited to land used for the existing commercial and recreational airport uses and activities as of December 31, 1994." Respondents contend that, by including the phrase "*but not limited to* land used for the existing commercial and recreational uses and activities as of December 31, 1994" in that definition, the legislature included in its definition of "airports" an unspecified amount of land that was not "used in 1994 in connection with the aircraft landing or taking off from the strip of land." They contend that we should understand that additional land to include land, like TLM's parcel, that is near a "strip of land used for taking off and landing aircraft" and

_____

[9] In our view, it is not a foregone conclusion that, if TLM's parcel were, by definition, part of the airport, the development TLM proposes would be an expansion of the airport; if that were the case, the development would not expand the size of the airport because the parcel would already be part of the airport. However, because, as explained below, we reject respondents' understanding of the statutory definition of "airport," we need not consider that question.

that could be used in connection with the aircraft using the strip.

We need not consider respondents' latter contention, because we disagree that the statutory definition of "airports" includes any land that was not "used in 1994 in connection with the aircraft landing or taking off from the strip of land." ORS 836.605(2). In the 1995 bill, in addition to defining which land was "airports," the legislature instructed the Department of Transportation to draft, and send to LCDC for enactment, rules specifying "[p]ermissible commercial and recreational airport uses and activities" that would be allowed on the land that it had defined as "airports." Or Laws 1995, ch 285, §§ 4(1), 5(2). The "[p]ermissible commercial and recreational airport uses and activities" included "emergency medical flight services, law enforcement and firefighting activities, search and rescue operations, flight instruction and ground training, aircraft maintenance, aircraft refueling, aircraft service and sales, aircraft rental, aeronautic skills training, aeronautic recreational and sporting activities, construction and maintenance of airport facilities and crop dusting and other agricultural activities." Or Laws 1995, ch 285, § 5(2).

Thus, the 1995 bill contemplated that (1) land that was, at the end of 1994, "the strip of land used for taking off and landing aircraft" and "all adjacent land used in 1994 in connection with the aircraft landing or taking off from the strip of land" would be airports and (2) going forward, LCDC rules would enumerate the "[p]ermissible commercial and recreational airport uses and activities" that would be allowed on airports.

With that understanding, and at the risk of repetition, we set out the disputed definition of "airports" from ORS 836.605(2) one more time: "the strip of land used for taking off and landing aircraft, together with all adjacent land used in 1994 in connection with the aircraft landing or taking off from the strip of land, including but not limited to land used for the existing commercial and recreational airport uses and activities as of December 31, 1994." Given the context that we have just described, the phrase "including but not limited to" in that definition reflects a recognition

that the existing uses "in connection with the aircraft landing or taking off from the strip of land" might include uses beyond those enumerated as "[p]ermissible commercial and recreational airport uses and activities." That is, *all* adjacent land used in 1994 in connection with the aircraft landing or taking off from the strip of land was part of the airport; although the uses affirmatively allowed on airports were limited to the enumerated airport uses, the land that made up the airport was not limited to the land occupied by the enumerated uses.

Thus, the legislature's inclusion of "but not limited to" in the definition of "airports" does not indicate an intention to include land that was not "used in 1994 in connection with the aircraft landing or taking off from the strip of land." ORS 836.605(2).[10] Accordingly, we reject respondents' contention to the contrary. Nothing in that definition provides a ground on which to conclude that development on land outside the airport boundaries, as established and regulated by OAR chapter 660, division 13, alone increases the size of a public use airport within the meaning of OAR 660-012-0065(3)(n).

B.  *Through the Fence Operations*

Next we consider the statutes that establish the through the fence pilot program, ORS 836.640 and ORS 836.642. TLM contends that, in those provisions, the legislature has redefined the boundary of the Aurora State Airport to include the subject property. As we will explain, those provisions do not change our understanding that an airport like Aurora State increases in size when the local government, in compliance with OAR chapter 660, division 13, adopts a map showing a larger airport boundary.

---

[10] The county relied on a similar understanding of OAR 660-013-0020(1), which defines "airport" as "the strip of land used for taking off and landing aircraft, together with all adjacent land used in connection with the aircraft landing or taking off from the strip of land, including but not limited to land used for existing airport uses." Although the rule's definition omits the statute's reference to "adjacent land used *in 1994* in connection with the aircraft landing or taking off from the strip of land," ORS 836.605(2) (emphasis added), that omission is immaterial here; the rule's definition of the relevant "adjacent land" is, like its statutory counterpart, limited to adjacent land "*used* in connection with the aircraft taking off or landing on the strip of land." OAR 660-013-0020(1) (emphasis added). It is undisputed that the subject parcel is not currently, nor has it ever been, "used in connection with" the airport or aircraft.

In 2005, the legislature enacted ORS 836.640 and ORS 836.642, which direct the Department of Aviation to establish a pilot program to encourage "through the fence operations." ORS 836.642(1); Or Laws 2005, ch 820, § 3(1). The Aurora State Airport is one of the program sites. ORS 836.642(2)(a); Or Laws 2005, ch 820, § 3(2) ("The pilot program shall operate at *** [t]he Aurora State Airport.").

In simplified terms, a through the fence operation is an airport-related business located on privately owned land that relies on the ability to taxi a plane to or from the airport runway. The statute defines "through the fence operation" as "a customary and usual aviation-related activity that *** [i]s conducted by a commercial or industrial user of property within an airport boundary; and *** [r]elies, for business purposes, on the ability to taxi aircraft directly from the property employed for the commercial or industrial use to an airport runway." ORS 836.640(5); Or Laws 2005, ch 820, § 2(4). "Customary and usual aviation-related activity" includes activities from two sources, both of which are established outside of the through the fence provisions: those "described in ORS 836.616(2)" and those "that a local government may authorize pursuant to ORS 836.616(3)." ORS 836.640(2); Or Laws 2005, ch 820, § 2(1).

ORS 836.616(2) contains a list of the uses and activities that "local government land use regulations shall authorize" "[w]ithin airport boundaries established pursuant to commission rules."[11] We refer to those uses and activities as "airport uses." ORS 836.616(3) provides as follows:

---

[11] Those uses and activities are a more developed version of the list of airport uses, set out above, that was originally enacted in 1995, Or Laws 1995, ch 285, § 5(2):

"(a) Customary and usual aviation-related activities including but not limited to takeoffs, landings, aircraft hangars, tie-downs, construction and maintenance of airport facilities, fixed-base operator facilities and other activities incidental to the normal operation of an airport;

"(b) Emergency medical flight services;

"(c) Law enforcement and firefighting activities;

"(d) Flight instruction;

"(e) Aircraft service, maintenance and training;

"(f) Crop dusting and other agricultural activities;

"(g) Air passenger and air freight services at levels consistent with the classification and needs identified in the State Aviation System Plan;

"All land uses and activities permitted within airport boundaries, other than the uses and activities established under subsection (2) of this section, shall comply with applicable land use laws and regulations. A local government may authorize commercial, industrial and other uses in addition to those listed in subsection (2) of this section within an airport boundary where such uses are consistent with applicable provisions of the acknowledged comprehensive plan, statewide land use planning goals and commission rules and where the uses do not create a safety hazard or limit approved airport uses."

Thus, the through the fence program concerns airport uses, and other uses allowed under certain circumstances within airport boundaries under ORS 836.616(3), conducted by private users, that rely on the ability to taxi aircraft directly to the runway. ORS 836.640(2), (5); Or Laws 2005, ch 820, § 2(1), (4).

The 2005 bill provided that the Department of Aviation shall establish a pilot program "to encourage development of through the fence operations" using, among other things, "public-private partnerships" and required the Oregon Department of Aviation to adopt "standards and guidelines for through the fence operations." ORS 836.642(1), (3); Or Laws 2005, ch 820, § 3(1), (3). It required DLCD and local governments to

"coordinate with the Oregon Department of Aviation to ensure that the applicable comprehensive plans and land use regulations, including airport zoning classifications pursuant to ORS 836.600 to 836.630, facilitate through the fence operations and support the development or expansion of the pilot site consistent with applicable statewide land use planning requirements."

ORS 836.642(4); Or Laws 2005, ch 820, § 3(4). It directed a state business assistance program to assist pilot sites in achieving objectives of the program. ORS 836.642(5); Or Laws 2005, ch 820, § 5. And it imposed deadlines for the

---

"(h)  Aircraft rental;

"(i)  Aircraft sales and sale of aviation equipment and supplies; and

"(j)  Aviation recreational and sporting activities."

ORS 836.616(2).

Department of Aviation's adoption of rules; coordination with DLCD and local governments; and amendment of comprehensive plans and land use regulations. Or Laws 2005, ch 820, § 4.

The bill did not modify land use statutes or rules. Instead, the through the fence program worked within the existing land use framework for airports. *See* Audio Recording, Senate Committee on Transportation, Apr 27, 2005, SB 680, at 17:10, 38:10 (statement of Bob Rindy, Department of Land Conservation and Development (DLCD)), http://records.sos.state.or.us/ORSOSWebDrawer/RecordHtml/4196707 (accessed Mar 15, 2022) (explaining that a previous version of the bill would have required changes to rules and statewide planning goals, but that the amended version—which was ultimately enacted—did not require any changes to the existing land use framework, and, for that reason, DLCD was withdrawing its objections to the bill); *see also Schaefer*, 312 Or App at 333 ("The text does not suggest that the legislature intended any section of ORS 836.642 to affect how land use requirements apply to the programs or uses of land at the identified airports; to the contrary, it explicitly makes the programs subject to 'applicable statewide land use requirements.' ORS 836.642(4).").

The legislative intention not to modify the existing land use framework for airports is evident in each section of the bill that relates to land use: The coordination requirement of section 3(4) of the bill, set out above, Or Laws 2005, ch 820, § 3(4), requires DLCD and local governments to ensure that land use laws "facilitate through the fence operations and support the development or expansion of the pilot site *consistent with applicable statewide land use planning requirements*." (Emphasis added.) The definition of "[c]ustomary and usual aviation-related activity" in ORS 836.640(2) relies on the airport uses allowed by ORS 836.616(2) and additional uses that may be allowed under ORS 836.616(3); thus, the group of uses that the bill addresses is the same group of uses that was already allowed on airports. Finally, in the provision requiring the Department of Aviation to adopt rules, the single paragraph that tangentially relates to land use recognizes the airport planning process governed by OAR chapter 660, division 13:

"The Oregon Department of Aviation, by rule, shall provide standards and guidelines for through the fence operations that * * * [r]equire submission, review, approval, and, as appropriate, revision of a facility site plan for each through the fence operation so that the real property covered by the site plan can be *incorporated into the airport boundary and coordinated with the other aspects of the airport master plan*[.]"

ORS 836.642(3)(b); Or Laws 2005, ch 820, § 3(3)(b) (emphasis added).

We pause here to consider the function of the provision set out immediately above. That paragraph instructs the Department of Aviation to adopt a rule requiring a procedure through which an entity that wants to establish a through the fence operation submits a site plan to the airport sponsor, and the airport sponsor reviews it, may require revisions, and, ultimately, can approve it. The purpose of that process is to allow the real property covered by the site plan to be incorporated into the airport boundary and coordinate the through the fence operation with the other aspects of the master plan.

For current purposes, that statutory paragraph is most notable for what it does not do: The statute itself does not modify the procedure for expanding the airport boundary, which, as we have explained, the legislature has committed to LCDC in ORS 836.600 to 836.630, and LCDC has comprehensively addressed in OAR chapter 660, division 13. Nor does the statute authorize the Department of Aviation to modify the procedure for expanding the airport boundary. Rather, the statutory text simply provides that the Department of Aviation's rule must require a procedure through which the proponent of a through the fence operation submits a site plan to the airport sponsor, and the airport sponsor reviews it, may require revisions, and, ultimately, can approve it. Although the purpose of the site plan approval requirement is related to land use—it is for the purpose of allowing the real property on which the through the fence operation is located to be incorporated into the airport boundary and coordinated with the other aspects of the airport master plan—under the terms of the statute, neither the statute nor the rule that the Department of Aviation is

authorized to adopt effectuates any change to the existing land use framework for airports.

Thus, the 2005 bill authorized the Department of Aviation to adopt a rule requiring a process through which the proponent of a through the fence operation submits a site plan to the airport sponsor, and the airport sponsor reviews it, may require revisions, and, ultimately, can approve it. Because neither the identified paragraph nor any other part of the through the fence statutes modifies, or authorizes modification of, the land use framework for airports, the airport sponsor's later use of the site plan to incorporate the property into the airport boundary and coordinate the operation with the other aspects of the airport master plan must take place through the airport planning process established in OAR chapter 660, division 13.

In 2009, the legislature amended the 2005 through the fence provisions, including by providing, for the first time, a definition of "airport boundary," which is specific to the through the fence provisions. "As used in this section and ORS 836.642: * * * 'Airport boundary' includes the combined public and private properties that are permitted to have direct access to the airport runway by aircraft." Or Laws 2009, ch 398, § 1(1); ORS 836.640(1).

As enacted, the 2009 bill did not add the term "airport boundary" to the through the fence provisions except in the definition section. Or Laws 2009, ch 398. As introduced, the bill included a section that explicitly relied on that definition of "airport boundary"; however, that section was not enacted. SB 170 (2009), § 3 (proposing to amend ORS 197.713 to allow "a county or its designee" to consider "for industrial development under this section" "[l]and within an airport boundary, as defined in ORS 836.640, of a public use airport participating in the pilot program established under ORS 836.642 to encourage development of through the fence operations"); SB 170 (2009), Senate Amendments (Feb 26, 2009) (removing section 3). Thus, the definition's only effect was to create a new meaning for the term "airport boundary" in the original 2005 through the fence provisions. *See* Audio Recording, House Committee on Transportation, SB 170, May 20, 2009, at 1:04:50 (statement of Dan Clem,

director, Oregon Department of Aviation), https://olis.oregon-legislature.gov (accessed Mar 15, 2022) (noting that the airport boundary would be expanded "for purposes of this bill" but not for all purposes).

As we have explained, the 2005 bill did not modify the existing land use framework for airports. We conclude, for two interrelated reasons, that the new definition of "airport boundary" added in 2009 likewise did not modify the existing land use framework for airports.

First, the definition of "airport boundary" in ORS 836.640 does not apply to ORS 836.600 to 836.630 or LCDC's airport planning rule, OAR chapter 660, division 13, which is required by and implements ORS 836.600 to 836.630. ORS 836.600 to 836.630 govern land use at airports; as explained above, ORS 836.640 and ORS 836.642 are free-standing provisions that do not. *See also Schaefer*, 312 Or App at 333; *id.* at 335 ("The provisions of ORS 836.600 to 836.630 are independent from ORS 836.640 and ORS 836.642, and they do not suggest that we should understand the latter provisions to have a greater effect on land use than their text indicates.").

Second, the new definition of "airport boundary" does not remove or modify the land use limitations, described above, that the legislature included in the through the fence provisions in 2005. The new definition expands the reach of "through the fence operations": The new definition of "airport boundary" means that through the fence operations now include customary and usual aviation-related activities that are conducted by a commercial or industrial user of property on "the combined public and private properties that are permitted to have direct access to the airport runway by aircraft," ORS 836.640(1), rather than just such activities conducted on the area encompassed by the actual airport boundary established by OAR 660-013-0040(1).[12]

_____

[12] As set out above, "[t]hrough the fence operation" means

"a customary and usual aviation-related activity that:

"(a) Is conducted by a commercial or industrial user of property within an airport boundary; and

"(b) Relies, for business purposes, on the ability to taxi aircraft directly from the property employed for the commercial or industrial use to an airport runway."

ORS 836.640(5).

That broader meaning of "through the fence operations" means that the through the fence pilot program now encourages development of through the fence operations on private properties outside the airport boundary established by OAR 660-013-0040(1) that are permitted to have direct access to the airport runway by aircraft. The Department of Aviation must adopt standards and guidelines for those operations. ORS 836.642(1), (3). Further, DLCD and local governments must consult with the Department of Aviation to "ensure that the applicable comprehensive plans and land use regulations *** facilitate [that larger group of operations] and support the development or expansion of the pilot site *consistent with applicable statewide land use planning requirements*." ORS 836.642(4) (emphasis added).

As the text emphasized immediately above indicates, the 2009 amendments did not change the textual limitations on the land use effect of the original through the fence provisions. Nor does the new definition of "airport boundary" give new meaning to ORS 836.642(3)(b), the provision that directs the Department of Aviation to adopt a rule that requires a process for approval of a through the fence operation. Again, that paragraph provides:

> "The Oregon Department of Aviation, by rule, shall provide standards and guidelines for through the fence operations that *** [r]equire submission, review, approval, and, as appropriate, revision of a facility site plan for each through the fence operation so that the real property covered by the site plan can be incorporated into the airport boundary and coordinated with the other aspects of the airport master plan."

ORS 836.642(3)(b).

Whatever effect the new definition of "airport boundary" has on the site plan approval requirement, it does not change the fact that, as explained above, ORS 836.642(3)(b) neither directly modifies the procedure for expanding the airport boundary nor authorizes the Department of Aviation to modify the procedure for expanding the airport boundary. Rather, that paragraph simply provides that the Department of Aviation's rule must require a process through which an

entity that wants to establish a through the fence operation submits a site plan to the airport sponsor, and the airport sponsor reviews it, may require revisions, and, ultimately, can approve it. That process ensures that the airport sponsor will be well positioned to incorporate the property into the airport boundary and coordinate the operation with the other aspects of the airport master plan in the course of the airport planning process established in OAR chapter 660, division 13.[13]

In sum, considering the through the fence provisions in the context of the statutory and regulatory scheme establishing airport boundaries, it remains clear that an increase in the size of a public use airport like Aurora State occurs when the local government, in compliance with OAR chapter 660, division 13, adopts a map showing an expanded airport boundary. Compliance with OAR chapter 660, division 13, is a necessary prerequisite to any "expansion[] *** of [a] public use airport[]" within the meaning of OAR 660-012-0056(3)(n).

TLM applied to Marion County for, as relevant here, a comprehensive plan map amendment and a zoning map amendment to allow airport-related development on the subject parcel. It is undisputed that the application was not part of the airport planning process established in OAR chapter 660, division 13. Thus, the application was not for an "expansion[] *** of [a] public use airport[]" within the meaning of OAR 660-012-0056(3)(n). LUBA erred in holding otherwise. We therefore reverse on petitioner's first assignment of error on judicial review and remand to LUBA.

---

[13] Our conclusion that the 2009 bill did not modify the existing land use framework for airports is also consistent with the provision's legislative history, which demonstrates that the purpose of the bill, as enacted, was to allow the pilot program to expand to more sites and to change the definition of "rural airport," not to change the operation of the statewide land use planning system. *See, e.g.*, Staff Measure Summary, House Committee on Transportation, HB 170 B (2009), May 20, 2009.

The proponents of the bill never suggested, nor did the legislature intend, that the bill would affect land use at airports with established pilot programs. If it had, DLCD's original objections to the 2005 bill—that changes to the land use framework for airports would require LCDC to amend the statewide planning goals and other rules, and would require legislative changes to ORS chapter 215—would likely have resurfaced.

Next, we briefly address petitioner's third and fourth assignments of error. In the third assignment, petitioner contends that LUBA erred in rejecting, as insufficiently supported, his contention that 2004 goal exceptions did not extend to cover the proposed development, which, he argued, would increase the intensity of uses and facilities on the adjacent parcel. LUBA reasoned that petitioner failed to argue or identify evidence in the record showing that "the uses and public facilities approved in the 2004 Exception were limited to any particular intensity."

Petitioner's argument before the county, and again before LUBA, was that, as a matter of law, the uses and public facilities approved in any exception are limited to the intensity necessary for the development for which the exception is taken. *See* OAR 660-004-0018(4)(b) ("When a local government changes the types or intensities of uses or public facilities and services within an area approved as a 'Reasons' exception, a new 'Reasons' exception is required."). It is undisputed that, when the exception for the adjacent parcel was taken in 2004, no development was contemplated on the subject parcel. Thus, under petitioner's legal theory, as a matter of law, the 2004 exception did not encompass any increase in intensity that will result from development of the subject parcel.

Under those circumstances, petitioner did not need to identify evidence that the 2004 exception was limited to a particular intensity; instead, his legal argument fully addressed that point. LUBA erred in declining to consider that issue. If, on remand, LUBA concludes that the goal exceptions are justified, it should consider petitioner's argument about new exceptions for the adjacent parcel.

In his fourth assignment on judicial review, petitioner argues that LUBA incorrectly reasoned that petitioner failed to sufficiently raise before the county his contention, made before LUBA in the third subassignment of the sixth assignment of error, that the county erred in relying on the provisions of ORS 836.600 to 836.630 to approve the requested land use actions without goal exceptions. As explained in petitioner's brief, petitioner raised that issue before the county sufficiently to allow the decision-maker

and TLM an adequate opportunity to respond: Petitioner described the applicant's reasoning, cited the relevant statutes, and explained that those statutes did not apply. *See Boldt v. Clackamas County*, 107 Or App 619, 623, 813 P2d 1078 (1991) ("ORS 197.763(1) does not simply require 'sufficient specificity,' but goes on to define what the objective of the requisite specificity is, *i.e.*, to afford the decision-maker and the parties 'an adequate opportunity to respond to each issue.' The plain thrust of that language is that the statute requires no more than fair notice to adjudicators and opponents[.]"). Thus, to any extent that the issues underlying petitioner's fourth assignment are not resolved by this opinion, LUBA should consider them on remand.[14]

Our disposition obviates the need for us to address petitioners' second assignment of error, in which petitioner contends that LUBA's application of OAR 660-012-0065(3)(n) is not supported by substantial evidence.

Reversed and remanded.

---

[14] As we understand it, the county relied on ORS 836.600 to 836.630 to support its determination that OAR 660-012-0065(3)(n) applied. As we have explained, under a proper interpretation of OAR 660-012-0065(3)(n), that was erroneous. However, to any extent that the county relied on ORS 836.600 to 836.630 independently of OAR 660-012-0065(3)(n), petitioner's argument that those statutory provisions do not apply to the development proposed on the subject property preserved an argument that the county erred in that respect.